IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**MARY A. CARPENTER,**                                        Case No. 3:16 CV 720

      Plaintiff,

      v.                                                                Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                            MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Mary A. Carpenter ("Plaintiff") filed a complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI") and disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the jurisdiction of the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 17). For the following reasons, the Commissioner's decision is affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for SSI in February 2012 (Tr. 206-09) and DIB in August 2012 (Tr. 213-14).[1] Her claims were denied initially and upon reconsideration. (Tr. 73, 91, 120-21). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 163). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at a hearing before the ALJ on February 25, 2014. (Tr. 29-71). On April 7, 2014, the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 9-23). The Appeals Council denied Plaintiff's request for

---

1. In the application for SSI, Plaintiff alleged a disability onset date of July 1, 2009 (Tr. 206, 231), but in her application for DIB she amended this date to January 1, 2009 (Tr. 213).

review, making the hearing decision the final decision of the Commissioner. (Tr. 1-5); 20 C.F.R.

§§ 404.955, 404.981. Plaintiff filed the instant action on March 23, 2016. (Doc. 1).

## FACTUAL BACKGROUND

Personal and Vocational Background

Plaintiff was 48 years old at the time of the ALJ's decision. (Tr. 23). She has an eighth

grade education. (Tr. 206, 236).

Hearing Testimony

### *Plaintiff's Testimony*

Plaintiff testified she was unable to do any lifting or carrying due to fibromyalgia, which

caused constant pain and numbness in her hands and arms, and pain in her legs and feet. (Tr. 36-

37). She described the pain as a "12" on a ten-point scale with pain medication. (Tr. 37). Plaintiff

estimated she could sit for five minutes at one time without discomfort, and stand for varying

lengths of time between five and twenty minutes. (Tr. 38). She stated she could only walk for

"[a] couple minutes" at a time. (Tr. 38). Plaintiff stated she would be unable to operate foot

controls because of pain in her feet (Tr. 39) and unable to operate hand controls due to pain and

numbness (Tr. 40). She did not use a cane. (Tr. 39). She usually took breaks when cleaning

dishes, but was able to "stay in pain" and complete the task at one time. (Tr. 40). Her boyfriend

cooked for her. (Tr. 40). Plaintiff was able to dress herself, perform personal hygiene tasks, and

bathe with a bath but not a shower (due to pain when standing). (Tr. 40).

Plaintiff was able to place her right hand on her head and frequently reach up over her

head with her right hand, but was unable to do so with her left hand due to "dislocat[ing] [her]

elbow a long time ago." (Tr. 44-45). She could reach in all other directions frequently with both

hands. (Tr. 45). Handing objects with either hand caused her pain. (Tr. 46). She could climb

2

stairs, stoop, kneel, drive a car (Tr. 46-47), but later stated these activities were limited (Tr. 57-59). She could not balance on ladders, ropes, or scaffolds (Tr. 46). Plaintiff stated she would be unable to experience extreme cold occasionally, or "handle a moderately noisy environment, like . . . an office setting". (Tr. 47). She initially stated she would respond inappropriately to supervisors, coworkers and the public, but upon further questioning conceded she would respond appropriately. (Tr. 47-48). She also stated she would require additional breaks beyond the standard fifteen minutes breaks twice a day and a half hour break for lunch due to pain. (Tr. 48-49). Plaintiff clarified that there would be "no amount of breaks that could get [her] through the day." (Tr. 49). She stated she would be absent from work "100 percent of the time" and would be unable to work even one day a month. *Id.*

Plaintiff testified she was depressed all the time, but denied thoughts of suicide. (Tr. 41-42). She later admitted however she "wouldn't mind so much if [she] just fell asleep and didn't wake up." (Tr. 61). She also complained memory problems. (Tr. 42). Plaintiff stated she cried "[a]ll the time" but had not sought treatment from a psychiatrist because she did not have insurance and could not afford it. (Tr. 42-43). The ALJ asked if Plaintiff had "looked into services that might be available for people who can't afford . . . a doctor". Plaintiff relayed she had not done so because she "didn't have the reason". (Tr. 43). She conceded that crying all the time is an appropriate reason to seek treatment. (Tr. 43). Plaintiff later stated, however, that she received other treatment at the Fulton County Health Department Clinic, a free clinic. (Tr. 50). She was unaware if this clinic offered mental health treatment[2]. (Tr. 51).

---

2. However, Plaintiff's brief states: "Plaintiff has no medical insurance and received her medical and *psychological* treatment through a Free Clinic and Emergency Room care." (Doc. 12, at 5) (emphasis added).

Plaintiff also completed an adult function report for the agency. (Tr. 253-60). She noted her hobbies, interests, and social activities included: reading, watching television, playing games, talking on the phone, playing cards, fishing, riding on motorcycles, using the internet, and visiting friends. (Tr. 257). She also stated she shopped, drove a car, and performed household chores including vacuuming and dusting. (Tr. 266-68).

### VE's Testimony

The ALJ asked the VE whether a hypothetical individual of Plaintiff's age, education, and with Plaintiff's two prior relevant jobs of phlebotomist and apartment manager with the following restrictions could perform any work activity:

> ***I would like you further to assume that the individual is limited to less than the full range of light exertional activities. Lifting—just a moment, please. No lifting, no carrying. Five minutes of sitting at one time. Five to 20 minutes of standing at one time. Walking no more than five minutes at a time. Pushing and pulling is the same as lifting. No right foot controls—actually right or left. Cannot use right hand controls. No reaching over head with the left, frequently with the right. No right or left handling, fingering, and feeling.
>
> ***
>
> No right or left handling, fingering, and feeling. None. Postural limitations, no ladders and scaffolds. No balancing, occasional stooping, kneeling, crouching, and crawling. Communicative limitation, limited to hearing and understanding simple oral instructions. Environmental limitations, no unprotected heights, moving mechanical parts, extreme cold or heat. Vibration and noise level, quiet, limited to quiet. Mental limitations, limited to understanding, remembering, and carrying out simple, routine tasks. Limited to simple work related decisions. And limited to simple—oh, excuse me, I said that. One hundred percent absent. This is not a person who can appear at work. Can the hypothetical individual perform any of the past relevant work she previously had as actually or generally performed in the national economy?

(Tr. 69-70).

The VE responded the individual would be unable to perform Plaintiff's past work or any other work in the national economy. (Tr. 70).

4

ALJ Decision

On April 7, 2014, the ALJ issued a written a decision in which she made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

2.  The claimant has not engaged in substantial gainful activity since January 1, 2009, the alleged onset date.

3.  Prior to March 31, 2009, the date last insured, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment.

4.  Relative to the claimant's supplemental security income application date of February 16, 2012, the claimant has the following medically determinable impairments: obesity, fibromyalgia, mild cervical and lumbar degenerative disc disease; sleep apnea, and status-post hysterectomy due to uterine cancer.

5.  Since February 16, 2012, the claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments.

6.  The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2009, through the date of this decision.

(Tr. 14-23) (internal citations omitted).

Relevant Medical Evidence

***Fulton County Free Clinic and Emergency Room***

In an undated treatment note from the Fulton County Free Clinic, Plaintiff reported difficulty sleeping due to pain. (Tr. 454). The treating physician diagnosed her with insomnia and restless leg syndrome, and prescribed Cymbalta. *Id.* At another appointment at the free clinic (the date of which is illegible), Plaintiff complained of pain, numbness, lack of energy, and difficulty sleeping. (Tr. 452). A physical examination revealed normal results. *Id.*

At an additional appointment, she reported pain in her feet and aching and numbness in her hands. (Tr. 450). A physical examination of her skin, lungs, heart, abdomen, and neurological system yielded normal results. *Id.* The physician noted possible fibromyalgia. *Id.*

In October 2010, Plaintiff complained of pain in her hands and feet; constant pain and numbness; chest pain at times; and frequent headaches. (Tr. 448). A physical examination was normal, except that Plaintiff tested positive for 16 out of 18 trigger points and two "sham" trigger points. *Id.* The impression was "fibromyalgia versus somatization disorder". *Id.* She was prescribed Neurontin. *Id.*

In November 2010, at a follow-up medication appointment, Plaintiff reported right hand and left groin pain. (Tr. 446). She was positive for 10 out of 18 trigger points and two "sham points". *Id.* The physician diagnosed her with fibromyalgia and increased the dose of Neurontin. *Id.*

A few months later, in February 2011, Plaintiff complained of back pain and migraines, and needed thyroid medicine. (Tr. 445). A physical examination yielded normal results. *Id.* It was noted she was "no longer on Neurontin[,] but want[ed] more". *Id.*

In May 2011, she continued to complain of hand and leg pain, dizziness, and daily migraines. (Tr. 444). She was prescribed Citalopram. *Id.*

In July 2011, Plaintiff complained of severe, radiating left hip pain for the past three days, and left foot numbness. (Tr. 419-20). A physical examination, found she was in no apparent distress; had full range of neck motion; and decreased range of motion and muscle spasm in her back, but no vertebral tenderness. (Tr. 421). The physician noted the examination was "suggestive of at least an S-1 radiculopathy on the left." *Id.* A CT scan of Plaintiff's lumbar spine revealed chronic mild degenerative disc and facet changes, but no acute lumbar abnormality. (Tr.

424).  A CT scan of Plaintiff's left hip was unremarkable. (Tr. 425).  The physician diagnosed Plaintiff with low back and hip pain; developmentally hypoplastic L5-S1; and degenerative joint disease of the lower spine. (Tr. 422).

In August 2011, Plaintiff again reported hand and leg pain, dizziness, and daily migraines. (Tr. 443). A physical examination was normal, and the physician listed fibromyalgia as a diagnosis. *Id.*

Plaintiff went to the emergency room in October 2011 after experiencing an altered mental status, agitation, nausea, and vomiting due to an accidental overdose after mixing prescription medication with alcohol. (Tr. 349, 352-53). Also in October 2011, Plaintiff reported fibromyalgia symptoms, poor sleep due to discomfort, irritability, and mood swings. (Tr. 442). The physician referred her for a sleep study. *Id.* A treatment note dated a few months later reveals Plaintiff did not undergo sleep study due to financial issues. (Tr. 441).  The physician also noted that while Plaintiff had been on numerous medications for fibromyalgia, none worked "particularly well." *Id.* A physical examination showed diffuse trigger points in her neck. *Id.* The physician's impression was fibromyalgia and insomnia. *Id.* Plaintiff was ordered to discontinue Neurontin and start Sertraline. *Id.*

In March 2012, Plaintiff reported pain in her extremities and feet, dizziness, and difficulty sleeping.  (Tr. 440). She was feeling depressed and frustrated with her current status. *Id.* It was noted the physician prescribed Zoloft at a previous visit, but she only took it for a  month before discontinuing the medication. *Id.*

Plaintiff went to the emergency room in April 2012 for a headache;  left shoulder and arm pain;  nausea;  and vomiting. (Tr. 463). A physical examination revealed a decreased musculoskeletal range of  motion; an inability to fully extend her left elbow due to a prior injury;

numbness, tingling, and tenderness over  fibromyalgia trigger points in her upper back; and "[w]eakness with oppositional testing of fingers in [her] left hand". (Tr. 464). Her condition improved with medication. *Id.* A CT head scan showed no evidence of a brain abnormality. (Tr. 468). A CT scan of Plaintiff's cervical spine revealed chronic degenerative changes, but no compromise of the bony canal. (Tr. 467).

The following month, it was noted Plaintiff underwent a sleep study. (Tr. 551). She was diagnosed with  obstructive sleep apnea and prescribed a CPAP machine. (Tr. 556, 581).

Also, in June 2012, Plaintiff reported continued fibromyalgia symptoms, and the physician noted she reported "lack of relief from traditional interventions." (Tr. 551). A physical examination revealed "multiple trigger points at the typical areas for fibromyalgia diagnosis." *Id.* Plaintiff also went to the emergency room in June 2012 complaining of abdominal pain, vomiting, and dizziness. (Tr. 483).  An ovarian cyst was discovered and Plaintiff underwent surgery to have it removed. (Tr. 487-88).

In August 2012,  doctors diagnosed Plaintiff with uterine cancer, for which she underwent a total vaginal hysterectomy.  (Tr. 513-14, 549). Also in August, a note reveals Plaintiff complained of depression. (Tr. 550).

In September 2012, Plaintiff reported a "host of somatic  complaints[,] including palpitations, dizziness, left eye twitching, insomnia, left arm pain, etc.". (Tr. 547). A physical examination revealed diffuse tenderness over her extremities, greater on the upper extremities. *Id.* Also in September 2012, Plaintiff went to the emergency room complaining of difficulty breathing.  (Tr. 563). A  physical examination of the respiratory system showed easy effort and clear lungs. (Tr. 564). Plaintiff denied having depression or anxiety. *Id.* She was diagnosed with right upper back pain consistent with muscular pain and a history of fibromyalgia. (Tr. 565).

In December 2012, Plaintiff complained of "pain all over", depression, mood swings, and menopausal symptoms. (Tr. 546). With regard to fibromyalgia, the physician noted: "She has failed multiple therapeutic attempts. Likely a component of depression and somatization is present." (Tr. 545).

Plaintiff continued to complain of headaches and dizziness in June 2013. (Tr. 543). She also reported continued discomfort. *Id.* A physical examination of her thyroid, lungs, heart, and extremities was normal. *Id.*

Opinion Evidence

### *State Agency Reviewers*

On May 8, 2012, state agency reviewer Bruce Goldsmith, Ph.D., determined Plaintiff did not have severe medically determinable mental impairment. (Tr. 84). He noted under the credibility assessment section: "[Claimant's] psychological allegation is credible but not severe." (Tr. 85). On reconsideration, Deryck Richardson, Ph.D., confirmed the conclusion that Plaintiff did not have a medically determinable mental impairment. (Tr. 99-100).

In August 2012, a state agency reviewing physician, Sarah Long, M.D., reviewed the record. Under the "Medically Determinable Impairments and Severity" section, fibromyalgia is listed as a severe primary impairment. (Tr. 83-84). Dr. Long then completed a physical residual functional capacity assessment, in which she found Plaintiff was able to perform light work with limited pushing/pulling with her left upper extremity. (Tr. 85-88). Specifically, she found Plaintiff could occasionally lift/carry twenty pounds; frequently lift/carry ten pounds; stand/walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; was limited with pushing and pulling with her left upper extremities; frequently climb ramps/stairs; occasionally climb ladders/ropes/scaffolds; was unlimited with regard to balancing,

stooping, kneeling, crouching, and crawling; limited in reaching with her left in front, laterally, or overhead; limited in handling and fingering with her left; unlimited with feeling; and should avoid concentrated exposure to hazards. *Id.*

On reconsideration, Lynne Torello, M.D., confirmed Dr. Long's findings. (Tr. 99-103). Fibromyalgia was again listed as a severe impairment. (Tr. 99).

### *Consultative Examiners*

In December 2013, Sushil Sethi, M.D., conducted a physical consultative examination. (Tr. 526-39). Plaintiff reported fibromyalgia with pain in both shoulder and legs since 2009, and migraine headaches. (Tr. 527). Plaintiff reported using a CPAP machine for sleep apnea without any complications in the form of recurrent daytime sleepiness. *Id.* A physical examination revealed Plaintiff was in no acute distress; had normal range of motion in the hips, and ankles, and upper extremities; a normal gait; could walk equally on her heels and her toes; and could squat. (Tr. 528-29). Her knees showed flexion at 140 degrees and extension 0 degrees. (Tr. 528). She had a reduced range of motion in her dorsolumbar spine. (Tr. 538). Plaintiff's ability to grasp, pinch, and perform fine manipulation and coordination was normal. (Tr. 529). She had no muscle weakness in the extremities, no muscle spasms, no swelling, and no neurological abnormalities. *Id.*

Dr. Sethi concluded: "Based on my objective findings, the claimant's ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying and handling objects may be slightly limited." *Id.* He determined Plaintiff could sit for eight hours in an eight-hour workday; stand and walk for six hours in an eight-hour workday; frequently lift 20 to 25 pounds; and occasionally lift 30 to 50 pounds. (Tr. 529). He also noted she could frequently operate foot controls (Tr. 532), engage in postural activity (Tr. 533), and be exposed to unprotected heights

10

and moving mechanical parts (and continuously be exposed to other environmental limitations) (Tr. 534).

In May 2012, Melissa Lanza, Ph.D., conducted a psychological consultative evaluation of Plaintiff. (Tr. 476-80).  A mental status examination revealed:  Plaintiff was on time for the evaluation, appropriately dressed, polite, cooperative; and had normal speech, well-organized and logical thought process, calm demeanor, and good insight and  judgment. (Tr. 478). Dr. Lanza diagnosed her with dysthymic disorder and assigned a global  assessment of functioning (GAF) score of 55.[3] (Tr. 479).

In the area of "Abilities and limitations in understanding, remembering, and carrying out instructions", Dr. Lanza noted Plaintiff reported problems understanding verbal and written information; and problems with short and long term memory. *Id.* In the area of "Abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks", Dr. Lanza noted Plaintiff "appeared able to maintain attention and concentration to topic." *Id.* Plaintiff, however, reported at times her mind "wanders off or goes blank[]" and that she would require frequent physical breaks during tasks, adding that she relied on others to complete some daily tasks. *Id.* In the area of "Abilities and limitations in responding appropriately to supervision and to coworkers in a work setting",

---

3. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32–33 (4th ed., Text Rev.2000). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM–V") (noting recommendations "that the GAF be dropped from [DSM–V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice"). However, as set forth in the DSM—IV, a GAF score of 55 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.* at 34.

Dr. Lanza noted Plaintiff was pleasant and cooperative, and reported a history of getting along with supervisors and coworkers; thus, Dr. Lanza found Plaintiff would be able to respond appropriately to coworkers and supervisors. *Id.* In the final area, "Abilities and limitations in responding appropriately to work pressures in a work setting", Plaintiff reported shutting down in response to work pressures of stressful situations, withdrawing from others, and isolating herself in her room. (Tr. 480). Dr. Lanza noted: "It appears that the claimant would have difficulty responding appropriately to work pressures at this time." *Id.*

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

4. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden then shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff only challenges the ALJ's denial of the SSI claim.[4] With regard to the SSI claim,

Plaintiff argues the ALJ erred in Step Two of the sequential evaluation by finding Plaintiff's

impairments not severe.

Step Two - Severe Impairments

Plaintiff alleges the ALJ erred in ending the analysis at Step Two by finding none of

Plaintiff's impairments severe. To meet her burden at Step Two of the sequential evaluation, a

plaintiff must show she has a medically determinable physical or mental impairment which is

severe in nature. 20 C.F.R. § 416.920. A severe impairment is one which significantly limits an

individual's ability to perform basic work activities. 20 C.F.R. §§ 416.920(c), 416.921; *Long v.

Apfel,* 1 F. App'x 326, 331–32 (6th Cir. 2001). Basic work activities are defined by the

regulations as "'abilities and aptitudes necessary to do most jobs,' and include: (1) physical

functions; (2) the capacity to see, hear and speak; (3) '[u]nderstanding, carrying out, and

remembering simple instructions;' (4) '[u]se of judgment;' (5) '[r]esponding appropriately to

supervision, co-workers, and usual work situations;' and (6) '[d]ealing with change in a routine

work setting.'" *Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 190 (6th Cir. 2009) (quoting

20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b)).

An impairment is only considered non-severe if it is a "slight abnormality that minimally

affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d

---

4. To qualify for DIB, Plaintiff must have been under disability on or before the date her insured status expired on March 31, 2009. (Tr. 14); 42 U.S.C. §§ 423(a)(c); 20 C.F.R. §§ 404.131(a), 404.320(b)(2); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). The record reveals no treatment records from prior to this date and Plaintiff does not challenge the ALJ's denial of the DIB claim. She therefore waives challenge. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in claimant's brief are waived). Furthermore, in her reply brief, Plaintiff clarifies she does not challenge the DIB denial. (Doc. 14, at 1-2).

860, 862 (6th Cir. 1988); *Salmi v. Sec'y of H.H.S.*, 774 F.2d 685, 691-93 (1985). The Sixth

Circuit considers the Step Two severity requirement as a *de minimis* hurdle in the disability

determination process. *Id.* If a claimant has at least one severe impairment, the ALJ must

continue the disability evaluation and consider all the limitations caused by the claimant's

impairments, severe or not. *See Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir.

2009) ("After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must

consider limitations and restrictions imposed by *all* of an individual's impairments, even those

that are not 'severe.'" (quoting SSR 96-8p, 1996 WL 374184, at *5)). If a claimant does not have

any severe impairments, as the ALJ found was the case here, the disability evaluation ends

because the individual is considered not disabled. 20 C.F.R. § 416.920(c).

Here, at Step Two, the ALJ determined since Plaintiff's SSI application date of February

16, 2012, she had the following medically determinable impairments: obesity, fibromyalgia, mild

cervical and lumbar degenerative disc disease, sleep apnea, and status post hysterectomy due to

uterine cancer. (Tr. 15). The ALJ, however, found none of these impairments to be severe. *Id.*

("Since February 16, 2012, the claimant does not have an impairment or combination of

impairments that has significantly limited (or is expected to significantly limit) the ability to

perform basic work-related activities for 12 consecutive months; therefore, the claimant does not

have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.* and 416.921

*et seq.*).") In making this determination, the ALJ specifically noted:

> Basic work activities are the abilities and aptitudes necessary to do most jobs.
> Examples of these include:
>
> 1. Physical functions such as walking, standing, sitting, lifting, pushing, pulling,
>    reaching, carrying, or handling;
> 2. Capacities for seeing, hearing, and speaking;
> 3. Understanding, carrying out, and remembering simple instructions;
> 4. Use of judgment;

15

5. Responding appropriately to supervision, co-workers, and usual work situations; and

6. Dealing with changes in a routine work setting[].

(Tr. 15-16) (citing SSR 85-28); *see also* 20 C.F.R. § 416.921(b).

### Consultative Examiners

First, Plaintiff asserts the ALJ's finding "Plaintiff has no limitations from her impairments" conflicts with the consultative examiners' determination Plaintiff would have certain limitations due to both physical and mental impairments. (Doc. 12, at 11). The Commissioner responds the ALJ appropriately considered and assigned little weight to the opinions of Drs. Sethi and Lanza. (Doc. 13, at 12-13, 15-16).

Social Security regulations state "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 416.927(c). A "medical opinion" is defined by regulation as a "statement[] from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairments . . . ." *Id.* at § 416.927(a)(2). "Acceptable medical sources" includes licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *Id.* at § 416.913(a)(1)-(5).

Under the regulations, there exists a hierarchy of medical opinions: first, is a treating source whose opinion is entitled to deference because it is based on an ongoing treatment relationship; second, is a non-treating source, which are those medical sources who have examined but not treated the Plaintiff; and lastly, is a non-examining source, those who render opinions based on a review of the medical record as a whole. 20 C.F.R. § 416.902.

When evaluating a medical source, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009)

16

(citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*. An ALJ must provide "good reasons" for the weight given to a treating source, *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 391 (6th Cir. 2004), but this is not so if a non-treating or non-examining source is involved. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (holding "the SSA requires ALJs to give reasons for only *treating* source" opinions) (emphasis in original); *Murray v. Comm'r of Soc. Sec*., 2013 WL 5428734, at *4 (N.D. Ohio) (finding "[n]otably, the procedural 'good reasons' requirement does not apply to non-treating physicians.").

Here, Dr. Sethi found, based on his objective findings, that Plaintiff "may be slightly limited" in sitting, standing, walking, lifting, carrying, and handling. (Tr. 529). The ALJ appropriately considered Dr. Sethi's examination and opinion in his decision, stating:

> Sushil Sethi, M.D., examined the claimant in December 2013 at the request of the State agency (Exhibit 8F). The claimant acknowledged to the doctor that she had not been required to undergo any chemotherapy or radiation relative to her uterine cancer. She noted that she used a CPAP machine due to a diagnosis of sleep apnea and denied any issues with recurrent daytime sleepiness or accidents. Regarding her thyroid, the claimant admitted that she was prescribed supplemental thyroid medication with good results. Dr. Sethi stated that the claimant's weight is 255 pounds and that her lower extremities showed no edema, cyanosis, or clubbing of toenails. She had normal range of motion at the hips and ankles and was able to walk on her tiptoes and heels and squat. Her gait was normal and she did not require any ambulatory aids. Her upper extremities also showed normal range of motion with no impingement at the shoulders and normal grasping, pinching, manipulation, and fine coordination. Tinel and Phalen tests were negative at the wrist and elbow levels with no muscle weakness or atrophy with arterial pulses being 5+. Range of motion of the cervical, thoracic, and lumbar spine were all normal with straight leg testing negative. The claimant's motor, sensory, and deep tendon reflexes were normal. The doctor diagnosed the claimant with history of fibromyalgia, pain in the shoulders, hips, legs, and arms, sleep apnea, hypothyroidism, and total hysterectomy for uterine cancer. It was the doctor's opinion that the claimant would be slightly limited in her ability to walk, stand,

sit, lift, carry, and handle objects and that she could sit, stand, and walk each for 6 hours during an 8-hour workday. Dr. Sethi further opined that the claimant could occasionally lift up to 50 pounds and frequently up to 25 pounds. In an accompanying medical source statement, the doctor opinioned that the claimant could sit for 8 hours without interruption and could stand or walk each for 6 hours without interruption and could in total during an 8-hour workday sit, stand, or walk for 8 hours. He further stated that the claimant could continuously use her bilateral hands, frequently use her feet and perform postural activates, frequently be exposed to unprotected heights and moving machinery, and continuously be exposed to other environmental limitations such as operating a motor vehicle, be exposed to pulmonary irritants or temperature extremes, and be exposed to vibrations (Id.).

(Tr. 18-19); *See* SSR 06-03p, 2006 WL 2329939, at *3.

The ALJ next appropriately provided an explanation as to why Dr. Sethi's opinion was afforded little weight:

> Consequently, the totality of the evidence does not support the existence of a severe physical impairment. In reaching this determination, the opinion of Dr. Sethi has been considered and is given limited weight. As discussed above, the doctor's examination failed to show any objective findings that would impose limitations on the claimant's ability to perform work tasks/activities as the claimant had normal range of motion, was able to walk with a normal gait, had normal ability to grasp, hold, pinch, and perform fine manipulation, no limitation or impingement regarding her shoulder and cervical, thoracic, or lumbar regions. Consequently, the objective record does not reflect the requirement to impose any limitations on the claimant's ability to lift, carry, walk, stand, or walk or in performing any exertional or non-exertional activities.

(Tr. 20-21).

The ALJ's explanation adequately touches on some of  the relevant factors, explaining that little weight was given to the opinion because it was inconsistent with and unsupported by Dr. Sethi's examination, and inconsistent with the objective medical evidence as a whole. 20 C.F.R. § 404.1527(c). The ALJ, therefore, did not err in assigning Dr. Sethi's opinion "limited weight".[5]

---

5. Even if the ALJ erred in her analysis of Dr. Sethi's opinion, the Court agrees with the Commissioner's assertion that the error is harmless. The Commissioner argues that since the

Similarly, with regard to Plaintiff's mental impairments, the ALJ adequately considered the opinion of Dr. Lanza and provided an adequate explanation for providing it little weight, once again touching upon the factors of consistency and supportability of the opinion. (Tr. 21); *see* 20 C.F.R. § 404.1527(c). The ALJ stated:

> At the request of the State agency, Melissa K. Lanza, Ph.D., evaluated the claimant in May 2012 (Exhibit 5F). The doctor noted that the claimant was able to make important decisions that included maintaining house and managing her finances and that her speech was well-organized and logical. Dr. Lanza diagnosed her with dysthymic disorder and assigned a GAF of 55. It was her opinion that it was likely that the claimant would be able to respond appropriately to coworkers and supervision and that she appeared able to maintain attention and concentration to topic. Because the claimant reporting shutting herself down in response to work pressures or stressful situations, it was the doctor's opinion that the claimant would have difficulty in responding appropriately to work pressure at that time (Id.). Limited weight is afforded to Dr. Lanza's opinion in that the doctor's opinion regarding the claimant's ability to respond appropriately to work pressures is based solely upon the claimant's self-report and not upon the objective findings contained in the record. There was no notation that the claimant experienced any stress-related "shutdown" during the doctor's evaluation. Further, the claimant is able to attend medical appointments, seek emergency room treatment when she deems it necessary, shop, drive, and play cards and video games. These activities show that the claimant can respond appropriately in stressful situations. The doctor's opinion regarding the claimant's ability to relate to others and maintain attention and concentration is supported by the objective record.
>
> Likewise, the assigned GAF of 55, which denotes moderate symptoms, has been considered and is given little weight as there is no explanation as to whether this score is associated with a symptom or functional assessment, and the record does not show the claimant requiring psychotropic medication from her primary physician or that she was referred for mental health services by him: *see: Diagnostic and Statistical Manual of Mental Disorders, (DSM-IV-TR), 4th ed., text revision, (July 2000)*.

(Tr. 21).

---

agency had previously determined that Plaintiff could perform light work (*see* Tr. 118), even if the ALJ had adopted Dr. Sethi's more restrictive opinion, she would have found Plaintiff not disabled at Step Five of the sequential evaluation. (Doc. 13, at 13). The undersigned agrees.

Additionally, because the ALJ found a medically determinable mental impairment, she went on to analyze it under the functional areas set out in 12.00C of the Listing of Impairments in correlation with the record and Dr. Lanza's findings. (Tr. 22); *see* 20 C.F.R., Part 404, Subpart P, Appendix 1). The ALJ concluded Plaintiff had mild limitation in the area of activities of daily living; social functioning; concentration; persistence, or pace; and no episodes of decompensation. (Tr. 22). Because Plaintiff's mental impairment caused no more than mild limitation, she determined it was not a severe impairment. *Id.*; *see* 20 C.F.R. § 416.920; s*ee also Williamson v. Sec'y of Health and Human Servs.*, 796 F.2d 146, 151 (6th Cir. 1986) (recognizing that the analysis may stop at Step Two, but noting that, if a claimant arguably satisfies the criteria of a listed impairment, it is not proper to preclude consideration of the listing).

The ALJ is tasked with making a determination about whether an individual's impairments are *severe*, not whether the impairments result in *any* limitations. Therefore, the ALJ's determination is not entirely inconsistent with the consultative examiners' opinion. The consultative examiners did find certain limitations, but it is up to the ALJ to determine whether these limitations are severe as required by Step Two of the sequential evaluation. The Court finds the ALJ appropriately considered the evaluations and opinions of Drs. Sethi and Lanza and provided adequately explanation as to her determination they were entitled to little weight. *See* 20 C.F.R. § 404.1527(c).

### State Agency Reviewers

Second, Plaintiff argues "the ALJ failed altogether to discuss the opinions of the State Agency Medical reviewers that Plaintiff's physical impairments were severe." (Doc. 12, at 16-17). The Commissioner briefly responds that this argument is "moot" because the state agency physicians found Plaintiff was capable of performing light work. (Doc. 13, at 13, n.5). Thus,

even if "the ALJ adopted these limitations, the agency already determined that such work restrictions did not prevent Plaintiff from performing work at step five of the sequential evaluation process." The Commissioner essentially asserts that if the ALJ erred, it is harmless. *Id.*

Initially, the ALJ did briefly mention the opinions of the state agents in relation to Plaintiff's SSI claim. She stated:

> The State agency medical consultants' mental assessments associated with her supplemental security income application are given great weight because, as discussed above, the objective record does not support the existence of a severe mental impairment (Exhibits 1A, 3A, 4A).

(Tr. 23).

While the ALJ gave great weight to the state agency reviewers' opinion Plaintiff did not have a severe *mental* impairment, the ALJ does not address the state agency reviewers' finding of fibromyalgia as a severe impairment. (Tr. 83-84, 99). Additionally, and presumably, state agency physician Dr. Long would not have proceeded to a physical RFC assessment had she not found a severe impairment.

However, the ALJ need not "discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (internal citation omitted); *see also Baranich v. Barnhart*, 128 F. App'x 481, 488–89 (6th Cir. 2005). Such is the case here. It is clear from the record the ALJ considered Plaintiff's impairment of fibromyalgia because she discussed medical evidence relating to such throughout her thorough analysis. (Tr. 16-20). After considering the entire medical evidence, she determined Plaintiff had medically determinable impairments of obesity, fibromyalgia, mild cervical and lumbar degenerative disc disease; sleep apnea, and status- post hysterectomy due to uterine cancer, but that none of these conditions were severe because they

21

did not significantly limited her physical or mental ability to do basic work activities. (Tr. 21)

("Consequently, the totality of the evidence does not support the existence of a severe physical

impairment."). Furthermore, diagnosis of a condition alone does not necessarily make the

condition severe. *See Higgs*, 880 F.2d at 863 (affirming dismissal where the record contained no

objective medical evidence to support a severe impairment). "The mere diagnosis of [an

impairment], of course, says nothing about the severity of the condition." *Id.*

In making this determination, the ALJ considered Plaintiff's subjective complaints, but

found they were not entirely credible. (Tr. 20). Contrary to Plaintiff's assertion, the ALJ

appropriately considered whether Plaintiff's statements regarding her impairments were

consistent with other evidence, including objective medical evidence. Pursuant to Step Two,

Social Security Ruling 16-3p states:

> An individual's statements may address the frequency and duration of the
> symptoms, the location of the symptoms, and the impact of the symptoms on the
> ability to perform daily living activities. An individual's statements may also
> include activities that precipitate or aggravate the symptoms, medications and
> treatments used, and other methods used to alleviate the symptoms. We will
> consider an individual's statements about the intensity, persistence, and limiting
> effects of symptoms, and we will evaluate whether the statements are consistent
> with objective medical evidence and the other evidence.

2016 WL 1119029, at *5.

Additionally, substantial evidence supports the ALJ's determination. First, the ALJ did

not err in finding the severity of Plaintiff's complaints inconsistent with the objective medical

evidence. (Tr. 20). Objective medical tests revealed mild degenerative changes in Plaintiff's

lumbar spine (Tr. 424), an unremarkable left hip (Tr. 425), and degenerative changes in the

cervical spine with no critical compromise of the bony canal (Tr. 467-68). Moreover, while there

were a few instances showing a decreased range of motion in her back (Tr. 421) and left elbow

(Tr. 464), and positive trigger points (including some "sham" trigger points) for fibromyalgia

(Tr. 441, 446, 448, 464, 551), a large portion of physical examinations largely resulted in normal results (Tr. 443, 445, 448, 450, 452, 543). During the consultative examination with Dr. Sethi, Plaintiff exhibited only slight limitations. (Tr. 528-29, 536-39). Second, the ALJ appropriately noted Plaintiff's conservative treatment was inconsistent with the severity of her complaints. (Tr. 20). *See, e.g., Lester v. Soc. Sec. Admin.*, 596 F. Appx. 387, 389 (6th Cir. 2015) (finding the ALJ "reasonably discounted [the treating physician's] medical opinion on the basis that it conflicted with other substantial evidence in the record," including his own treatment notes which "generally showed that [the claimant] was receiving conservative treatment . . . "). The record reveals Plaintiff's impairments were managed with medication. (Tr. 440, 441, 445, 446, 448, 454, 464). Third, the ALJ appropriately noted Plaintiff's ability to perform certain household chores and engage in certain activities revealed she was not as limited as she alleged. *See* 20 C.F.R. § 416.929(c)(3)(i). Plaintiff stated she performed household chores (including vacuuming and dusting), drove a car, shopped, played video games, spent time on the internet, and rode on a motorcycle. (Tr. 20) (citing Tr. 257, 266-68, 478). Fourth, the ALJ appropriately found Plaintiff's history of uterine cancer and sleep apnea were under control. (Tr. 20). The record does not show any further treatment for uterine cancer following an August 2012 hysterectomy. (Tr. 513-14). Also, her CPAP machine controlled her sleep apnea. (Tr. 20) (citing Tr. 527).

Furthermore, even if the ALJ had erred at Step Two, the error would be harmless. *See Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (where remand would be an "idle and useless formality", the Court is not required to "convert judicial review of agency action into a ping-pong game.") (quoting *N.L.R.B. v. Wyman-Gordon Co.*, 395 U.S. 759, 766 n.6 (1969)). As the Commissioner points out, even if the ALJ had adopted the state agency reviewers' opinion Plaintiff was limited to light work, the agency determined these limitations

did not prevent her from working at Step Five of the Sequential Evaluation. (Doc. 13, at 13) (citing Tr. 118-19). Thus, remanding the case would essentially be futile.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying benefits supported by substantial evidence, and therefore affirms the decision of the Commissioner.

 s/James R. Knepp II
United States Magistrate Judge